Filed 8/1/23; Certified for Publication 8/16/23 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JENNIFER ANN HATLEY, | |
| Plaintiff and Appellant, | E080000 |
| v. | (Super.Ct.No. DVHE2202266) |
| JAMES BRADDY SOUTHARD, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Jeffrey M. Zimel, Judge. Reversed with directions.

Morrison & Foerster, Robert W. May, James R. Sigel, Joel F. Wacks, Morgan O'Neill Mitruka, Emani N. Oakley; Family Violence Appellate Project, Cory Hernandez, Jodi Lewis, and Jennafer Dorfman Wagner for Plaintiff and Appellant.

Manatt, Phelps & Phillips, Benjamin G. Shatz, Andrew Satenberg, Stephanie Roeser, Ryan Patterson, and Lauren Chee for California Women's Law Center as Amicus Curiae on behalf of Planitiff and Appellant.

No appearance by Defendant and Respondent.

1

A woman sought a domestic violence restraining order (DVRO) against her estranged husband. The trial court denied her petition while indicating that her allegations of a pattern of control and isolation by limiting her access to money, communication, and transportation did not fall within the statutory definition of domestic violence or abuse.

Under the law, attempts to control, regulate, and monitor a spouse's finances, economic resources, movements, and access to communications are abuse. We therefore reverse the order denying the restraining order and remand for a new hearing on whether a restraining order is appropriate. The trial court did not address Hatley's request for spousal support, and we order that considered on remand as well.

# I

## FACTS

Hatley filed a request for a DVRO against her estranged husband of nine and a half years, respondent James Southard, under the Domestic Violence Prevention Act (DVPA). (Fam. Code, § 6200 et seq., unlabeled statutory citations refer to this code). She also requested an order granting her spousal support.

A. *Hatley's Allegations and Evidence of Abusive Conduct*

Hatley alleged Southard had engaged in a pattern of abuse where "[t]he abusive behavior and control happens daily" and "occurred for the entire length of the marriage." She submitted a declaration and documentary evidence describing numerous incidents of physical, financial, verbal, and emotional abuse.

There was an allegation of physical harm. Hatley described an incident in 2017 or 2018 when she became ill and "was losing consciousness and waking up struggling to breathe." She asked Southard to call 911, but he "became angry and told me that if I tried to get medical care he would get rid of our dog." Hatley says she then crawled to the bathroom and lost consciousness. She woke to find Southard "yanking me up off the floor by my arm." Southard told her she was "being over dramatic." The next morning Hatley woke up with bruising on her face, chest, and near her pubic bone. She said the bruising on her chest "look[ed] to be from fingers or a hand," and said it had been caused by Southard smothering her with a pillow. She submitted photographs showing these injuries.

On another occasion, Southard threatened her physically. Hatley asked Southard about an exchange of sexually explicit text messages with a person who later defrauded him and attempted to use his messages and photographs to blackmail Hatley. When Hatley objected to his behavior, she said he "responded by leaning into me and putting his hands up like he was going to choke me while in a fit of rage." She said, "I was afraid for my physical safety and afraid James might try to hurt me out of anger."

Southard allegedly also used suicide threats to manipulate Hatley. She asserted that his threats of self-harm began in 2013 and continued for nearly a decade. On one occasion, he became agitated because Hatley refused to take out or cosign for a loan which he could not qualify for on his own. Later that night, he sent her text messages threatening suicide. He warned her not to call 911 because if she did "there wouldn't be a

3

good outcome" and asked if she wanted to be responsible for that. She said he eventually "told me that he had taken his Klonopin to kill himself but threw them up." However, after he received medical attention, "the lab report from the psychiatric hospital found no traces of [Klonopin] in his system." Hatley later counted his medication and found none missing.

Hatley described Southard as exercising control over her by limiting her ability to earn and spend money. She said he "consistently restricted my access to funds by canceling ATM cards, making threats against me, or preventing me from working." She explained Southard "had a specific way of controlling how and when [she] accessed money." "[H]e would deposit money from his checks into a savings account that [she] could not access." To get access to funds, Hatley had to tell Southard what she needed to buy and the exact amount, and "he would transfer the requested money into the main account if he approved it." She said she had to ask permission for purchases as minor as a Starbucks coffee. If there was any money left over, "it was understood that I was not to use more than I requested, and if I did, he would cancel the card or get angry."

These attempts at control worsened after the couple separated and Southard moved to Kentucky. Southard "ordered me not to use our atm card, knowing that I had to pay rent." When she used the card to buy necessities anyway, she said he "threatened to get me in legal trouble for using his money and said he wouldn't give me money until a judge ordered him to."

4

Southard also exercised control over her by limiting and later depriving her of her vehicle. Hatley had put her own money down to buy the vehicle and used money from student loans to make the payments. She said he nevertheless "forc[ed] me to depend on him for transportation, which . . . isolated me." It also interfered with her ability to see her daughter without his assistance, because the child lives with her father, who is not Southard. When Southard drove Hatley places, she said he sometimes drove erratically and dangerously

Eventually, Southard took Hatley's car to Kentucky, though he knew that meant she "would not be able to work or see my daughter or earn money to provide for myself." When he learned Hatley was considering asking for spousal support or the return of her car, she said Southard "threatened to interfere with my custody of my daughter and my relationship with my daughter's father."

After moving to Kentucky, Southard told Hatley he would no longer pay for her cell phone service. She said he did so though he knew "I could not afford a phone line and that I communicate with my daughter via cell phone." Hatley said Southard also used his control over her phone to "track[] my phone calls" while they were separated "to see if I was talking to other men." She alleged that Southard used access to necessities as a constant threat. "Anything I needed that was a necessity, like my cell phone, was hung over my head." "[D]isconnecting my cell phone service was a common threat because James knew I spoke to my daughter on my cell phone."

5

Hatley said "there have been incidents involving sexual abuse" but did not detail them. She nevertheless described numerous sexually degrading comments in which Southard expressed frustration and hostility after learning she had dated another person when they were separated. Among other things, he said, "Go fuck your boyfriend and leave me alone!!," "At least I waited this long to spread my fucking legs!!," "You're dirty to me now," "[A]s soon as I found out you were fucking someone you no longer mean shit to[] me," "How could you move on so fast from me and have sex with another man so fast after me??," and "You ran out and slept with someone. That makes me want to puke."

B. *Hatley's Request for a DVRO and Spousal Support*

Hatley sought a DVRO prohibiting Southard from abusing, contacting, or coming near her or her child. She said her child needed protection because Southard had "threatened to interfere with my custody of my daughter, and tried to use our relationship to hurt me" and had contacted her daughter when he was unable to reach her. She also sought protection of her animals.

Hatley also requested spousal support. That request was supported by an Income and Expense Declaration (Form FL-150). She also asked the trial judge to award her temporary control of her car and her cell phone. In a supplemental declaration, Hatley repeated her request for spousal support and noted "[t]he court can order support to a spouse in domestic violence cases, even before proving abuse had occurred."

6

The judge denied a temporary restraining order, because "[t]he facts as stated in form DV-100 do not show reasonable proof of a past act or acts of abuse." The judge set a hearing on the DVRO.

C. *Southard's Response*

After Hatley filed her request for a restraining order, Southard retained counsel and filed for divorce. He also contested Hatley's DVRO request and accused her of requesting a DVRO only after Southard petitioned for divorce. (Hatley later pointed out she filed the request for a DVRO before Southard filed for divorce.)

Southard asserted that no DVRO was necessary because he had moved to Kentucky and did not intend to return to California. He denied physically abusing Hatley and claimed her black eye had been caused by her falling and hitting her head on the toilet. He did not attempt to explain the other bruising. He conceded the text messages and emails Hatley provided were accurate and said he was "embarrassed about the dialog [Hatley] and I had over those texts."

Southard objected to Hatley's request for spousal support because "[t]his matter can be heard through the divorce proceedings." However, he filed an Income and Expense Declaration.

D. *DVRO Hearing*

At the hearing on the DVRO, Hatley was unrepresented, but Southard was represented. Both appeared telephonically, Hatley due to illness and Southard due to distance. Hatley testified about Southard's control over her finances, harassing messages,

and suicide threats. She also testified that Southard deprived her of her car, interfering with her ability to work. She said he started driving the car before they separated and after they separated drove it to Kentucky days before she was set to start a new job and she lost the job as a result. Southard chose not to cross-examine Hatley and did not testify.

During her testimony, Hatley was audibly upset, and the trial court repeatedly asked her to try to collect herself. The judge indicated he did not accept that her testimony was evidence of abuse as defined in the DVPA. After her testimony about the car, he asked her what abuse she was complaining about. "What abuse? Tell me what you're complaining of. I mean, I know that he took your car, and the car meant a lot to you, but what else? He called you names?"

Hatley provided additional details about Southard's degrading insults and unwanted contact. "It wasn't just calling me names, it was repeatedly telling me, 'If you get a lawyer when you're a college grad, well you can get F'd. You're pathetic. I know where you live.' I have the text messages that I can pull up that go into more detail, but it was just everything he could possibly think of. Like, he would go into these rages and, 'You think you can "F" me, this, that, and things will be okay. I don't think so.' And there was one conversation we had over text when he was here. This was for two hours. I kept asking him to leave my house, and he wouldn't leave. He refused to leave. And then he would leave and then he would come back and he would find a reason to come back, and I didn't want him there. And I told him I didn't want him there and that he needed to

8

stay away for the night and he didn't. And it's the instances—these incidents that happened all the time. You know, when he gets like this, I can't get away from him, you know, like the communication. It doesn't matter what I do and what I say –"

The trial judge did not accept those incidents as incidents of abuse under the DVPA. He interrupted her and said "let's try to focus on what Mr. Southard did to you that you feel was either violent or abusive . . . I don't want to hear all the problems of your marriage and your relationship." Hatley then testified about Southard harassing her and taking her car, and the trial judge again directed Hatley to focus on allegations of physical violence, asking "Has Mr. Southard ever hit you?"

The judge also refused to allow Hatley to testify about Southard's sexual abuse because she had not included sexual abuse in her filings. Hatley testified "there has been sexual abuse" and explained she hesitated to get into details. "I don't know if I have to get into great detail or not. It's hard to talk about. It's embarrassing." The judge asked, "Did you write about that in your request for a restraining order?" Hatley appeared to understand the judge to be asking whether she had written about specific incidents and answered, "No, I didn't write about it." At that point, the judge said, "So then if you haven't alleged it in your paperwork, then I'm not going to allow you to talk about it here today." As stated above, Hatley's declaration avoided specifics but alleged "there have been incidents involving sexual abuse."

After her testimony, the judge asked Hatley what she was hoping he would order. She explained she wanted Southard to "stay away" and she "[didn't] want to be

9

harassed." The trial judge then asked whether Southard lived in Kentucky and when he last came to Hatley's home. After Hatley answered he last came to her house on April 19, Southard's counsel moved for judgment on the ground that Hatley's allegations failed to satisfy her burden, even if taken as true, and "don't fall within the domestic violence prevention act."

The trial judge agreed and entered judgment in favor of Southard under Code of Civil Procedure section 631.8, which provides that "[a]fter a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment."[1] The trial judge said, "I do not find that the Petitioner has met the burden of proof in the conclusion of their case." He explained: "I understand that you're upset, Ms. Hatley, but what you're telling me does not rise to meeting the definition of domestic violence or abuse, all right? So your request for a restraining order is denied." The trial judge did not address Hatley's request for spousal support.

## II

## ANALYSIS

Hatley argues the trial judge erred in denying her request for a restraining order because he refused to hear her testimony regarding acts of sexual abuse Southard

---

[1] The minute order says the judge granted summary judgment for Southard. However, the judge said he was ruling under Code of Civil Procedure section 631.8. An oral ruling controls where there is a conflict with a minute order. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.)

committed against her. She also faults the trial judge for failing to consider the remaining evidence of abuse and instead concluding the incidents could not constitute abuse under the DVPA.

The DVPA defines domestic violence to include abuse of a spouse, former spouse, or the child of a party. (§ 6211, subds. (a) & (e).) The Legislature defined "abuse" broadly to include intentionally or recklessly causing or attempting to cause bodily injury, sexual assault, placing a person in reasonable apprehension of imminent serious bodily injury, or engaging in behavior that could be enjoined under section 6320. (§ 6203, subd. (a).) The behaviors incorporated by the reference to section 6320 include "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating . . . , falsely personating . . . , harassing, telephoning, . . . destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party." (§ 6320, subd. (a).)

The last phrase, "disturbing the peace," is itself a broad category of abuse under the DVPA. The term "refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly . . . and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies. This conduct includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a

11

person's free will and personal liberty." (§ 6320, subd. (c).) Coercive control includes unreasonably engaging in conduct aimed at, among other things, "(1) Isolating the other party from friends, relatives, or other sources of support. [¶] (2) Depriving the other party of basic necessities. [¶] (3) Controlling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services."

"Under the DVPA, a court may issue a protective order to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved upon reasonable proof of a past act or acts of abuse. The statute should be broadly construed in order to accomplish its purpose of preventing acts of domestic violence." (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 115 [cleaned up] (*Marriage of F.M.*).)

In general, we will defer to the trial judge when reviewing an order granting or denying a DVRO. We review such orders for abuse of discretion. (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226 (*Davila*).) We also review a trial judge's failure to consider evidence for abuse of discretion. (*Marriage of F.M.*, *supra*, 65 Cal.App.5th at p. 116.) And we review the judge's factual findings under a substantial evidence standard of review. (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.)

However, "[j]udicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the legal principles governing the subject of the action. Thus,

12

we consider whether the trial court's exercise of discretion is consistent with the statute's intended purpose. If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law requiring de novo review." (*Marriage of F.M.*, *supra*, 65 Cal.App.5th at p. 116 [cleaned up].)

The hearing record calls into question the court's understanding of what constitutes abuse under the DVPA. During Hatley's testimony, the judge repeatedly asked her to focus her testimony on abuse or violence. For example, when she reported the contents of some of Southard's demeaning text messages, many of which insinuated threats, the judge commented "let's try to focus on what Mr. Southard did to you that you feel was either violent or abusive . . . I don't want to hear all the problems of your marriage and your relationship." Similarly, when she complained he had deprived her of her means of transportation and threatened to cause problems if she tried to recover her car, the trial judge asked, "What abuse? Tell me what you're complaining of. I mean, I know that he took your car, and the car meant a lot to you, but what else? He called you names?" In the end, the judge concluded, "I understand that you're upset, Ms. Hatley, but what you're telling me does not rise to meeting the definition of domestic violence or

abuse," and the judge denied her request for a protective order on that basis. This formulation of the ruling taken together with the questions and comments to Hatley during her testimony lead us to conclude the judge committed legal error.

The DVPA's very broad category of abusive conduct warranting a DVRO includes acts of violence and threats of violence, as the trial judge suggested, and those may well constitute the bulk of trial court DVRO cases in practice. Limiting abuse to those categories, however, ignores the plain language of the DVPA and the legislature's purpose that language reflects. (See § 6203 ["Abuse is not limited to the actual infliction of physical injury or assault"].) Abuse includes physical abuse or injury, as well as acts that "destroy[ ] the mental or emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497.)

The core of Hatley's complaints against her estranged husband was that he used a variety of methods to control her and limit her freedom. Actual violence and threats of violence played but a small part of her allegations. She said Southard had smothered her with a pillow to keep her from leaving their home to obtain medical care, an incident which left bruises on her body. But the bulk of the evidence she submitted through declarations and hearing testimony concerned his acts aimed at controlling, regulating, and monitoring her movements, communications, and finances. She explained Southard "would deposit money from his checks into a savings account that [she] could not access" and require her to put in a request for funds before he would transfer the funds to an account she could access. If she used more than she requested, he would cancel the ATM

14

card or get angry with her. According to Hatley, these problems lasted throughout the relationship but worsened after they separated, and Southard moved to Kentucky. By then he ordered her not to use the card for necessities and threatened her with legal action. These attempts at financial control, if established, would constitute incidents of "[d]epriving the other party of basic necessities," and "[c]ontrolling, regulating, or monitoring the other party's . . . finances, economic resources, or access to services," which are *by definition* abuse under the DVPA. (§ 6320, subd. (c)(2) & (3).) Treating these incidents as just evidence of marital problems was error. (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 822 ["acts of isolation, control, and threats were sufficient to demonstrate the destruction of [petitioner's] mental and emotional calm. . . . The trial court erred in failing to consider this testimony as the basis for a DVPA order; this evidence demonstrated abuse within the meaning of section 6320"].)

The same is true of Hatley's evidence that Southard exercised control over her by limiting and then depriving her of her vehicle and phone. She testified he had long made her dependent on him for transportation and interfered with her ability to see her daughter. Though she had purchased a vehicle by the end of their relationship, he co-opted it and later took it to Kentucky. He did this knowing that without it she would lose her job and the ability to see her daughter. After moving to Kentucky, Southard also told Hatley he would no longer pay for her cell phone service. She said he did so though he knew it would have the effect of further isolating her. When he learned she might ask for spousal support or the return of her car, she said he threatened explicitly to interfere with

15

her custody of her daughter. Exercising control over a spouse by regulating her movements and communications is defined as abuse under the DVPA, as is isolating her from supportive relationships. (§ 6320, subd. (c)(1) & (3); see also *Marriage of F.M.*, *supra*, 65 Cal.App.5th at p. 119 ["[S]eeking to exercise control over a person by taking away their phone, [is an] actionable form[] of abuse under the DVPA"].) Hatley's evidence was relevant to establishing abuse, and the trial court erred by not recognizing that.

Hatley also presented evidence that Southard tracked her phone calls. She testified Southard used his control over her phone to track her calls while they were separated "to see if I was talking to other men." When he learned she was dating someone else, he showered her with abusive text messages, which she filed. These repeated messages were sexually degrading and plainly had the capacity to shame Hatley and disturb her peace of mind. Such acts may also constitute abuse under the DVPA, contrary to the trial judge's direction that she should not present them because he didn't "want to hear all the problems of your marriage and your relationship." (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 398-399 (*Perez*).)

As the First District explained in *Perez*, "There can be little doubt that . . . phone calls and texts constitute continuing abuse under the statute. [Citation.] The phone calls and texts harassed [petitioner] and disturbed her peace of mind. [Citations.] . . . He threatened her by saying '[f]uck you bitch' and telling her to stop seeking child support. He told her she was a 'crazy mom' for putting her kids through the 'trouble' of reporting

him for child abuse. He told her she was 'going to pay for it' and that children 'pay the consequences.'" (*Perez*, *supra*, 1 Cal.App.5th at pp. 398-399.) The trial judge in that case found the petitioner had been "subjected to 'annoying phone calls,'" but concluded "they did not 'rise to the level of a pattern of harassment.'" (*Ibid.*) The First District held the trial judge had erred, and we reach the same conclusion.

Hatley presented allegations and evidence of several kinds of abusive conduct, which could warrant a DVRO if her testimony is ultimately credited. We conclude the trial judge's error was prejudicial because there is a reasonable probability Hatley would have obtained a more favorable result if the judge had considered whether these incidents establish, under the totality of the circumstances, that the conduct she complained of destroyed her mental or emotional calm. (*Priscila N. v. Leonardo G.* (2017) 17 Cal.App.5th 1208, 1215.) Even if every one of Hatley's allegations of abuse, taken alone, might not warrant a DVRO, the probability is that some of them do, or that they do taken all together.

We nevertheless do not follow Hatley's request that we direct the trial judge to enter a DVRO on remand. A trier of fact must find past abuse by a preponderance of the evidence to issue a DVRO. (*Davila*, *supra*, 29 Cal.App.5th at p. 226.) Disturbing the peace of another person requires an analysis of the totality of the circumstances (§ 6320, subd. (c)), which includes factual and credibility determinations. It is appropriate for the trial judge, in the first instance, to make the determinations as to the acts for which there is a reasonable proof of past abuse, and as to what circumstances disturbed Hatley's

mental or emotional calm. These findings will determine the scope of any restraining order. Hatley, for example, argues the DVRO should extend protections to her daughter and pets, which each require showings of good cause that will depend on the facts. (§ 6320, subds. (a), (c).) While Hatley points out Southard admitted to sending harassing text messages, he did not concede most of the other abusive conduct. Even if the text messages were a sufficient ground for issuing a DVRO, the rest of Hatley's evidence is relevant to the appropriate scope of any DVRO that may issue. We will therefore reverse the order denying a DVRO and remand for further proceedings consistent with this opinion. We note Hatley alleged and submitted evidence of other kinds of abuse which we did not find it necessary to address. Our omitting these incidents from the discussion does not imply she cannot rely on them at a new hearing.

On remand, Hatley should be allowed to testify as to particular past acts of sexual abuse. She correctly argues she should have been allowed to testify about those acts, as she generally alleged sexual abuse in a supplemental declaration. Hatley's general allegation was sufficient to put Southard on notice, without her detailing the specifics in writing.[2] The DVPA "does not impose on a victim of domestic abuse a pleading

---

[2] The trial court may have believed Hatley did not make even the general allegation, because she did not direct the court to it at the hearing. As litigants in most DVRO cases are unrepresented by counsel, that should "influence[] how these hearings should be conducted—with the judge necessarily expected to play a far more active role in developing the facts, before then making the decision whether or not to issue the requested permanent protective order. In such a hearing, the judge cannot rely on the propria persona litigants to know each of the procedural steps, to raise objections, to ask all the relevant questions of witnesses, and to otherwise protect their due process rights." (*Ross v. Figueroa* (2006) 139 Cal.App.4th 856, 861.) While we need not here reach

*[footnote continued on next page]*

obligation that he or she describe all individual actions taken by the alleged abuser in the DVRO request in order later to testify about those acts at the hearing, as long as the alleged abuser is placed on notice of the general allegations." (*Davila*, *supra*, 29 Cal.App.5th at p. 222.) On the contrary, such general allegations provide notice and a responding party will have a "meaningful opportunity to respond to the specific allegations at the hearing, and to request a continuance if he need[s] additional time to respond." (*Ibid.*)

Finally, Hatley also argues the trial judge erred by failing to address her request for a spousal support order under section 6341, subdivision (c). She rightly points out that a finding that domestic violence occurred is not a prerequisite for awarding spousal support under the DVPA. (*In re Marriage of J.Q. & T.B.* (2014) 223 Cal.App.4th 687, 703-704.) Thus, the denial of a protective order did not moot the issue. Moreover, Southard was plainly on notice that Hatley had asked for spousal support. Hatley submitted an income and expense declaration with her petition, and Southard submitted his own income and expense declaration. (*Id.* at p. 704.) In any event, since we are remanding Hatley's petition, the trial judge "should conduct a noticed hearing to determine whether a spousal support award is proper, and consider all relevant issues before making an award." (*Ibid.*)

---

Hatley's claim that we should reverse the order denying her a DVRO on the due process ground that the judge did not provide sufficient assistance to her as an unrepresented party, if she lacks counsel after remand, that should influence how the trial court conducts any hearings.

### III

### DISPOSITION

We reverse the order denying a domestic violence protective order and remand for a new hearing on whether a domestic violence protective order is appropriate, the proper scope of any such order, as well as whether a spousal support order is warranted. Hatley is entitled to her costs on appeal.

RAPHAEL_____

J.

We concur:

MILLER_____

Acting P. J.

MENETREZ_____

J.

Filed 8/16/23

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| JENNIFER ANN HATLEY, | |
| Plaintiff and Appellant, | E080000 |
| v. | (Super.Ct.No. DVHE2202266) |
| JAMES BRADDY SOUTHARD, | ORDER CERTIFYING OPINION |
| Defendant and Respondent. | FOR PUBLICATION |

THE COURT

       The request for publication of the opinion filed on August 1, 2023 is GRANTED. The opinion meets the standard for publication as specified in California Rules of Court, rule 81105(c). It is ORDERED that the opinion filed in this matter on August 1, 2023 be certified for publication.

       CERTIFIED FOR PUBLICATION

RAPHAEL
                                                                                            J.

We concur:

MILLER
       Acting P. J.

MENETREZ
   J.